Please be seated. Your Honor, the third case of the morning call 210-643 Julie Quinn v. Illinois Department of Children and Family Services. On behalf of AFON, Mr. Michelotto, on behalf of the FLE, Ms. Jan Hughes. Now I see a lot of people sitting at council table. Will more than one person be speaking or we're just here persistent? Okay, thank you. Moral support is good too. All right, Mr. Otto. May please the court. Good morning. My name is Michael Otto with the law firm of Jenner and Block. And along with our co-counsel, the Family Defense Center, we represent appellant Julie Quinn before your honors today. This appeal presents several issues of first impression for Illinois Review and Courts. But the common thread running through each of those issues is overreach and abuse of power by the Department of Children and Family Services. In the proceedings below, the department entered an indicated finding against Ms. Quinn based on a void regulation. They failed to resolve her appeal of that finding in a timely fashion. And the finding itself was based exclusively on an inadmissible double hearsay. Moreover, the proceedings below the hearing was turned into a referendum on Ms. Quinn's life history with alcohol rather than focusing on the events at issue of January 29, 2009. Isn't it proper in an administrative hearing to consider hearsay? It's a weight argument, isn't it? No, Your Honor. The Administrative Procedures Act, which there's no contest to governance, makes clear that the rules of evidence are to be followed. Now, there is an exception for evidence of a type commonly relied upon by reasonably prudent men in the conduct of their affairs. That exception doesn't fit what happened here. Because some of the events were unfounded. So they were unreliable. I disagree. Some of the events, in particular one drinking episode, was unfounded by DCFS. So even by their standards, it's unreliable. In fact, both of the extrinsic, the July 2008 and the May 2009 episodes about which the police were allowed to testify, both of those were investigated and deemed unfounded by DCFS. But the administrative law judge still relied on that? Yes. Now... But for impeachment, isn't that correct? That's right, Your Honor. That's the only basis on which the introduction of that evidence is defended before this court impeaching Ms. Quinn's credibility as to her statement she had been sober since January 2006. And why is that improper? That's improper at first because the Department itself enlisted that testimony. Julie Quinn was the first witness called. She was called as an adverse witness by the Department. The Department asked her, aren't you an alcoholic? And she admitted, yes, I am. The Department asked her, how long have you been sober since January 2006? And then the Department, having elicited that testimony, which does not directly relate to what happened on January 29, 2009, three years later, the Department proceeded to impeach her on that testimony they had elicited, not only to cross-examine her about it, but to bring in extrinsic evidence of these other purported collateral bad acts. And then in closing argument, as we point out in our brief, the Department relied almost exclusively on that testimony by the police, which now purportedly is being defended only as impeachment, to show Julie Quinn has done bad acts at other times and thus she must have acted badly at this time. That's not permissible. It's clearly impermissible. Now, the only direct evidence that even suggests anything untoward happened on the date in question, January 29, 2009, is double hearsay. And that's the notes of a non-testifying investigator whose name I likely will not pronounce correctly, but I think it's Analia Coberta. She wrote a note. She went out and spoke to the child MQ, allegedly, very shortly after the hotline call came in from Chris Quinn. And just to give a little bit of background, Chris Quinn and Julie Quinn were at the time still married but estranged. They had been in the process for over three years of divorcing. And there was a custody hearing scheduled less than two weeks out on February 9, 2009. So on January 30th, Chris Quinn gets MQ to visit for a weekend visit. He calls DCFS and alleges that Julie Quinn has committed child neglect. DCFS investigates. Analia Coberta investigates first. And she speaks to MQ. She speaks to Chris Quinn. And she writes a note. She never testifies. MQ doesn't testify. No one else with any knowledge of what happened on January 29, 2009 testifies except for Julie Quinn. And what she says is this was a day like many others. She picked her daughter up from soccer, went along with two friends, dropped the friends off, brought her daughter home, made dinner. She did her homework. MQ did her homework. She put her to bed. And they got in a little bit of a back and forth because MQ, who was nine years old at the time, wanted to sleep with Ms. Quinn. Ms. Quinn said you are nine years old. You sleep in your own bed. That's the only evidence that anybody, that's the only evidence, competent evidence that was admitted as to what happened on January 29, 2009. Now MQ's note that Ms. Coberta, or MQ's statement that Ms. Coberta, which was recorded in her note, says really doesn't change that much. She just says, she doesn't say she saw her mom drinking. She doesn't say she saw any alcoholic beverages. She just says I've been around this all my life. I know when my mom has been drinking because her eyes were glazzy, her speech was slurred, and she wasn't acting like herself. But this notorious note does say I wasn't locked in my room, doesn't it? It also says I was. Which is part of the call, part of what the call was about. That's right, Your Honor, yes. And yeah, the DCFS essentially dropped that at the hearing because there was absolutely nothing, less than nothing to sustain that. Coming back to the Administrative Procedures Act. I have one other question. Please. The February custody hearing was suspended pending a resolution of this, or did it go forward? It was continued, Your Honor, and it ended up being resolved four days before the first hearing in this case. On June 19, 2009, four days before the June 23 hearing in this case, Chris Quinn was awarded custody of MQ. Do we have anything in this record that would tell us why or give us that trial court's finding? No. Frances Pacheco did testify before this court, and my understanding is that her recommendation was to be presented in the divorce proceeding, and she recommended that Chris Quinn get custody. But as far as the actual basis, we don't have any transcript of those proceedings or anything here that directly states what the trial court's decision basis was. But I think it's a rational inference, and it would be irrational to ignore the likelihood that the trial court would take into effect that in the custody determination he or she was being called upon to make in this divorce proceeding, one of the parties before him was the subject of an indicated finding by the Department of Children and Family Services that she had neglected the very child whose custody was before the court. And, again, we do not have evidence of what actually was introduced, but certainly the court would be among the parties allowed to access records from the Central Register. But we don't think that that happened. At least we don't have anything here. If you're asking me what I think, I do think that it happened, but we do not have records. Well, that's important. Neglect and custody are two different issues. I mean, neglect might be relevant to a custody determination. Exactly. All right. Let's, if we may, because time does fly here because we're having fun, the issue of how DCFS exists I think comes even before the administrative hearing. What's the enabling legislation for DCFS? Sure. DCFS is set up by the DCFS Act. But the rule at issue in this case, Allegation No. 60, is promulgated pursuant to the Abused and Neglected Child Reporting Act, commonly referred to shorthand as ANCRA. And in this case, Allegation 60 is void because it's inconsistent with the legislative intent. There's no dispute as to the guiding principles. There's no dispute that DCFS, as any administrative agency, is a creature of statute. There's no dispute that its rules must conform to the statute which it purports to implement, and that rules, when challenged, if they are found to extend, enlarge, or alter the statutory authority, those rules are void. They're void ad initio, as if they were never created or promulgated at all. And the Department concedes, or agrees with us, that such a challenge to a rule is determined by reference to the legislative intent. You look at the plain language of the statute, but what you're really looking for is the legislature's intent. This is a plain language legislative intent day. This is the third case today, so we have some good information about that. Well, I won't repeat what Your Honor has probably already heard about what the rules are, but I will point out that the $64,000 question for the Department is, isn't it plain as day that as of July 1st, 1980, the legislature intended that for purposes of ANCRA, neglect was no longer defined in terms of a child being subjected to an environmental injurious? Now, this is set out in the briefs, but just by a brief way of background, before 1980, ANCRA included in the definition of neglect that a child be subjected to an environmental injurious to the child's welfare. And there are some cases that talk about injurious environment, environment injurious, and those cases are kind of interesting in their distinction, but what's the problem with this provision? I agree it's not in the current ANCRA legislation, but what's the problem with that legislation generally? Or that language generally? The regulation is that the statute does not only not contain that language now, but it used to contain it, and the legislature took it out. The legislature took it out in Public Act 81-1077, and as you- Because they felt it was confusing and needed, it was too general, language needed more definition, and doesn't DCFS provide that definition in Rule 60? Yes, that was the basis for why they took it out. No, DCFS doesn't provide that clarification. And as a follow-up to that, as I think a threshold issue there, again, DCFS is a creature of statute. It doesn't get to say, we're going to take back the power that the legislature took away because we think we've solved their concerns. If DCFS thinks it's important to be allowed, for purposes of ANCRA, to define neglect in terms of environment injurious, they can go back and lobby the legislature to put that language back in. As indeed, DCFS lobbied the legislature to take it out in 1980. Now, it's still in the Juvenile Court Act and the Adoption Act. Exactly. Isn't it illogical to have it in those two acts and not in ANCRA? The legislature didn't think so. It was present in those two acts, the Adoption Act and the Juvenile Court Act, before 1980, and the legislature left it intact there, and we explain in our brief why. The Juvenile Court Act, and I think the Adoption Act as well, are, they need a broad jurisdictional basis, because what you're looking at there is the possibility of terminating parental rights, of removing children. That's not what ANCRA does. ANCRA basically does two things. It allows DCFS to investigate allegations of abuse or neglect, and if it finds them indicated, it allows them to put the parent or the guardian or whoever's responsible on a list. They don't get to take the child out of the home. ANCRA is about the parent or guardian. It also provides guidance on when you must report if you're a mandated reporter, which is probably the most important aspect of ANCRA, correct? I think that's exactly right, Your Honor. That's because you're looking at the behaviors of the person, not the environment that the child might be in at the time. You're looking at the behavior of that person who you, as a mandated reporter, must report. Exactly. Isn't it pretty serious to be on that list, though? I mean, that affects someone on that central registry. That affects someone's life, liberty in a sense. I mean, it's hard to get a job. Absolutely. It's quite a stigma to be on that list. Absolutely, Your Honor. Yes. Yes. And we don't, in any way, if anything I've said suggests a minimization of the impact of being on that list, I withdraw it because you're exactly right. No, we wouldn't. But yes, you're exactly right. Your Honor, excuse me, Justice Burkett, you're exactly right that ANCRA also, perhaps the main focus is the mandated reporters. Providing guidance. Providing guidance to them as to when they must report. And bear in mind, mandated reporters, their obligation to report is backed up by criminal penalties, class A misdemeanor, or even a class 4 felony for failure to report. And for that reason as well, it's important that the definitions of abuse and neglect be firm and clear so that they know what their obligations are. And that's why the legislature narrowed the definition of neglect in 1980. They narrowed it to take out this environment injurious language for exactly the reason that Your Honor observed, that they were concerned about it could be interpreted a number of ways. And I got off on a tangent, but I think now I'm going to come back. You asked haven't they solved it. And the first answer is they don't get to solve it. It's up to the legislature to put that language back in because DCFS is a creature of statute. But the more direct answer to Your Honor is no, they haven't solved it. Because all Allegation No. 60 contains is a list of examples. But by the express terms of Allegation 60, that's a non-exclusive list. So, yes, they've given some additional examples of things that are considered injurious environment. But by the express terms of Allegation 60, it's not limited to those. So maybe some more guidance, but it still has the same vagueness concern as it ever did. And the number of proceedings, anchor proceedings, that's up. Excuse me. I'll leave that alone because that's not on the record. So if we kind of boil this down, we're looking for very objective observations, and those are included in that list rather than this rather broad, subjective observation of environment injurious to keep things more compact and clear? Well, I think the concern that we have is that Allegation No. 60 is inconsistent with the plain legislative intent that you can't define neglect for purposes of anchor in terms of environment injurious. If DCFS thought that it was sufficiently important that some of those individual listed circumstances still be part of the definition of neglect, and they thought that they fell within the statutory language, they could promulgate those individual allegations as part of a different allegation. But they haven't done so. Right now, they're part of this environment injurious allegation, and that's not permissible. I'll reserve the rest of my time for rebuttal, but we just request that this court reverse and amend with directions to expunge the indicated finding. Thank you. Ms. Youth? Your Honors, my name is Jan Hughes, Assistant Attorney General for the Department of Children and Family Services. May it please the Court, the Allegation No. 60 we believe is consistent with the statutory definition of neglect, and neglect is a very fluid term. It has to be, I think, because of the various circumstances that can fit under neglect, and the legislature simply has not defined neglect in a way that would prohibit DCFS from having a valid Allegation No. 60 of injurious environment. Well, didn't the legislature talk about four specific issues of neglect? Don't they identify four very objective bases of neglect? Well, yes, they did. Why do you, not you personally, but why does DCFS feel compelled to broaden that scope? Well, I don't think that DCFS has broadened the scope, and neglect generally is failure to provide the care necessary for a child. Well, that may be true in other settings, but with respect to Inegrita, as Justice Hutchinson asked, there's four delineated examples, and they're not examples. They are an exclusive list. The statute doesn't say including. It just lists these four, and the conduct here fit none of the four you would concur with. You would agree with that, correct? I'm sorry. Would you say that one more time? The facts, did the facts demonstrate any of these four, that LQ was not receiving care, that she had been abandoned, that she was receiving crisis intervention, or that she was born with a controlled substance in her system? Did the facts in this case indicate any of those four? I'm talking about the Inegrita definition, the Abuse and Neglect of Child Reporting Act definition of neglect. How did finding number 60, or that rule, apply to any of those four? And I'm summarizing them. Right. Section 3 of Inegrita defines a neglected child in terms of four circumstances, and those are the circumstances that Justice Hoppe had just summarized. Well, I don't think that we can ignore, and I don't think the legislature meant for just those four to be neglected. I mean, obviously the statute says failure to provide necessary care for the well-being, including adequate food, clothing, and shelter. I think that that just generally shows the intent of the legislature to include things under neglect that would be just a failure to provide the care that a child needs. And certainly none of the allegations in the regulation, I don't believe, are mentioned in the statute. Yet those have been recognized by courts for years as being a valid basis in which to indicate someone for neglect. Bruises, cuts, welts, sexual assault, but those aren't mentioned in the statute. And I think that we can't forget that also under ANCRA, it says if someone has been found, a child has been found neglected by a court under the Juvenile Court Act, that if the person is also indicated, there should be no right to question the facts of that case. Do we have a Juvenile Court Act determination in this case, or as I asked counsel, do we have any trial court determination in this case that this child has been neglected? There was, as far as I know... In this record? No, as far as I know, there was not a circuit court case. And you're talking about the Burris case, I think. Well, I'm talking in general that it would be odd, I think, to say that the legislature did not intend for injurious environment to be a form of neglect under ANCRA. And yet to say that, however, if someone is found by a court to have neglected a child for injurious environment under ANCRA, then they have no right to question the basis of that. And it wasn't, you know, obviously the Burris court found that, but why would the ANCRA take injurious environment out of the definition? And it was just a phrase standing alone. Well, according to Mr. Otto, it was at the request of the Department of Children and Family Services, maybe before we were involved. That's true, and I think that, you know, maybe it is valid. And certainly we've seen in many administrative review cases where the legislature has left gaps or hasn't defined a term. And that, I think, is one of the purposes for having an administrative agency is to flush that out through regulations and to do what the legislature can't do. And I think that... But the legislature had done it. And then they took it out. I know. That's the difference here. It's not that you're doing something they can't do. They clearly had done it for several years. And for some reason, you know, I don't doubt Mr. Otto's historical analysis here, but for some reason, it's no longer there. Well, I think, and frankly, if it was DCFS that said, you know, we're afraid this is going to lead to a lot of litigation, take it out. And Representative Peters, I think, made a good point. And, you know, it's going to lead to litigation. It's vague. And until it can be defined, he didn't say this wasn't neglect. He didn't say that this wasn't a valid definition of neglect. And, you know, obviously we have cases all the time where litigation does ensue because the legislature has a phrase or a term that isn't otherwise defined. Isn't it, as I asked earlier, Mr. Otto, isn't it clear that it was taken out because it's misunderstood by laypersons, but professionals who are working for the Department of Children and Family Services have an understanding of what an injurious environment is, as opposed to a mandated reporter who were making reports because the child was in a dirty home, which turned out to be frivolous and it costs a lot of time and effort for investigators to go out and investigate the home. Only to unfound a report takes a lot of valuable time. Doesn't it make sense that we would remove it but not affect the discretionary acts of the case managers and DCFS employees? I'm sorry. I think that the purpose of all of these allegations is to guide that person that answers the hotline call and has to somehow categorize what it is that they're hearing of the facts of the case so that it is easier for the investigators to pinpoint what exactly is the problem. Assuming that allegation number 60 is consistent with the plain meaning of the act, how does that relate to the proper care of the child in this case? Well, allegation number 60, one of the, and it has many factors to be considered, and one of them is use of alcohol. Illegal use. It's not just use. It's illegal use of drugs or alcohol. It's not illegal to get drunk in your own home if you're an adult or become an alcoholic if you're an adult. That's not illegal. But I believe that it said, and I don't want to misquote it. It says illegal consumption of alcohol. Exposure to, and I don't know that alcohol was illegal. Was there an allegation that she was unlawfully exposing the child to alcohol? Well, I think that in the broad sense there was if, in fact, Quinn had been drinking and exposed the child to the effects of the alcohol. I mean, it wasn't exposure in that the child was forced to drink something. You understand that the point of the question is that that's a pretty broad interpretation of that language. But I think just, you know, not only that, I think that, you know, just considering the child's age, the history of the mother's alcoholism, and the investigator said that she took that into account, and the times that there were problems and the police were called. And I think that when you take all of that into consideration, those are factors that DCFS was right to look at in determining that this was an indicated report. But let's go to that issue, if we may. And that is the allegation that came before them was January 29, 2009. Right. But yet somehow in the course of the hearing, lots of other testimony about other police visits to the house that ended up being unfounded and where police officers actually testified, I didn't see any evidence of that, were introduced. How is she to know, and this is probably a notice and a due process issue, how is she to know as she walks in that door what she's defending against? How did she know? You know, it's the department's responsibility to prove that it was founded at that hearing. Well, she's walking in the door thinking they're going to talk about January 29, 2009. But all of a sudden they're talking about something in 2008 and something maybe a little later. How did she know that was going to happen? Well, certainly it was evidence. Well, she had, I mean, that happened to her. But more importantly, she's defending against a day. How do all of these other things come in? Well, I think the other evidence was going to her credibility. She wasn't, like you say, Your Honor, she was only indicated for January 29. But that doesn't mean that other evidence from other behaviors or problems with the police or that kind of thing. I think that she should have expected that that would come into the hearing. And she was represented by counsel, and he could have dealt with it and probably did deal with it the best he could to try to minimize that or to question the validity of it or to question the fact that we were even hearing about that. But I can't imagine that a mother who has had these kinds of problems with the police would think that the hearing would be about only January 29. But those other incidents, the two that were actually introduced, were unfounded. So why would she think that those are going to come up? Well, first of all, I don't know why they were unfounded. She doesn't know why they were unfounded. No one does. Well, I think we now know because the police officer in the one case definitely said, I went in there, I didn't see any glassy eyes, I didn't see any slurred speech, I didn't see anything. Well, but the other police officer said that he did smell alcohol. He did. But still, there were other factors that, you know, unfounded it, so to speak. But again, I don't know why, just because it was unfounded, that she would think that it wouldn't be somehow appropriate. I mean, wasn't this improper impeachment with the collateral matter? No, I don't believe that it was. I mean, these incidents happened. The police were called. There's a daughter, a young daughter, living with a single mother. But aren't they prior bad acts, so to speak? I don't think so. They weren't used to indicate her. They were used for her credibility. And I think that the ALJ was, and it may be a fine line, but I think that the ALJ was very clear that she did not find Mrs. Quinn credible. And part of that was these other acts. I think that the ALJ focused solely on the evidence to indicate or to uphold the indicated report that happened on January 29th. I mean, that was the focus of the hearing. And do you also want to address, while we're talking about evidentiary issues, the double hearsay issue? Why were the notes allowed? I have to say I've done these types of cases a long time, and I've never heard double hearsay referred to in these cases. And I think that that was one of the things that I pointed out about the Appellant's brief, is that we're not in a court. We're in an administrative hearing. And as the Montalbano case in the 4th District said, forum makes all the difference. And the administrative rules, the statute says that DCFS, or any agency, frankly, I'm sorry, can admit things that would otherwise be considered hearsay if there's something that a reasonable person would rely on. But this was pretty crucial testimony, was it not? Pretty crucial information about an interview with the daughter, correct? Right. And there was no opportunity to question the investigator who had gone to the home to get that information. But that was only the weekend investigator that took the hotline call. The investigator that did most of the work was there. And she did testify. And she testified to her speaking with Mrs. Quinn and her husband. But not the daughter. No. Nothing I believe. And the daughter's concerns are what activated the father's call. So wouldn't those concerns be pretty critical to this particular allegation? Well, I think that that's why the rules of DCFS recognize that a child's statements can come in as an exception to hearsay because they are children. I've never seen a child testify in these types of hearings, ever. And the whole investigation record, again, has to come in because DCFS has the burden to prove that that is an accurate record. And so I think that it's important to remember that these are different than circuit court cases. You say at page 28, I have one more question, you say at page 28 of your brief that rule number 60 or allegation number 60 fills a gap left by the statute. What's the gap? I'm sorry, on page 28? Page 28. Can I refer to a regulation? Number 60. Is that what you're asking about? I'm sorry, I'm having trouble hearing this. I don't mean to be. Can DCFS fill the gap where the legislature has not in terms of filling in the definition of the statute? The definition of environment injurious that's been taken out of the ANCRA but yet is in the rule. I guess the question was what do you mean by filling the gap? Is DCFS legislating here? Taking the place of the legislature and doing this? No. And I think that we have to acknowledge it was removed from the statute 30 years ago. 20 years later DCFS named this allegation number 60 a term that I think frankly was coincidentally similar to what was done. I can't imagine 10 years ago DCFS would have known that the legislature took it out 20 years before that. I can't imagine that they knew that. I mean as many administrations change and people change. They have you. Maybe they did but I think it would be hard to say that they were aware of that. And one last point is I think that if we just stop focusing on the name of this allegation and refer to it as perhaps failure to take proper care of a child, we wouldn't even be in this discussion. And I think for that reason they have a lot of exalting form over substance. And I would ask that the Circuit Court's decision be affirmed. Thank you. Just briefly, Your Honor, a few points. First I'd like to address the double hearsay concern again. If double hearsay has never been raised before as an objection, then it's high time that it be. I'm not aware in any of the cases that counsel cited, Your Honors, in none of those cases were the notes of a non-testifying investigator admitted and the appellate court address a hearsay objection to it. I mean counsel may be right. Maybe it's never come up before. Maybe they've never – maybe this is not a regular process of admitting notes for the truth of the matter asserted when the investigator doesn't testify. I hope it's not. Well, assuming that this is a weekend investigator, which is what Ms. Hughes just said, and then her notes go to Ms. Robinson who is – or Investigator Robinson who is a weekday investigator. I don't know what her – And then she or someone – her supervisor has to make a decision. Would this be something that the decision maker could go back and rely on like in the Wilson v. Clark where, you know, Wilson v. Clark, you go back to everything that's in this particular record? I mean I think that's the point that she's trying to make, but it causes some issue here because it's the only record that relates what the child said. Exactly. If the supervisor wanted to rely on this evidence in terms of the credible evidence standard for doing the initial indication, we're not challenging that. What we're challenging is that they have the burden of proving by a preponderance of the evidence at this hearing that this purported neglect occurred. And the only evidence – the only evidence is this note of this out-of-court statement. The Administrative Procedures Act explicitly provides a right to cross-examination. And the Illinois Supreme Court has gone that one better in the Balmoral Racing Club case and said in an administrative proceeding you have a right to cross-examination as a matter of due process. This is an administrative proceeding, yes it is, but that doesn't mean that your rights are thrown away. It doesn't mean that you don't have the right to defend yourself. And what opportunity did Julie Quinn have to cross-examine on the only evidence against her? The fact that Laverne Robinson testified didn't give her any ability to cross-examine at all because Laverne Robinson didn't speak to MQ until the day after she indicated Ms. Quinn, when she finally got around to speaking to the child herself, asked the child if her mother had been drinking, and the child said no. But, Ms. Robinson said, that didn't play any part in my investigation. That was just something I had to do as a follow-up. I didn't consider it. There was no opportunity to cross-examine on the only evidence against her. This type of proceeding is improper and unfair and should be so held by this court. Very briefly on the validity of Allegation 60, the question came up whether this fell within failure to provide care. Failure to provide care and subjection to an injurious environment, there may be some overlap. I mean, let's not be unrealistic. You could imagine a situation that could fall under both of those labels. But they're not co-extensive. Because if they were, the legislature wouldn't have had that language in there in the first place. It would be merely duplicative. If it did mean exactly the same thing, they would have accomplished nothing when they took that language out. And that goes against the statutory presumption of legislative interpretation. And if they did mean exactly the same thing, it would be completely irrelevant that that language was present in the Juvenile Court Act and the Adoption Act. They don't mean exactly the same thing. They can't mean exactly the same thing. It would violate all presumptions of statutory interpretation, so to hold. We renew respectfully our request that this court reverse on all of the issues raised in our brief. I didn't get to the timing of this issue, so we'll stand in abreast with respect to that, Your Honor. Whose decision are we reviewing here? You're reviewing Director McEwen's decision, Your Honor. The administrative law judge, correct? Well, no, the administrative law judge. Yes, that the director affirmed. Exactly, exactly. Thank you. I thank you very much for your attention, Your Honor. Thank you. Thank you. Counsel, thank you for your arguments. A decision will be made in due course. We will stand and reset.